1  GRACE JUN: SBN 287973
2  GRACE JUN, ATTORNEY AT LAW
   501 West Broadway, Ste. 1480
3  San Diego, CA 92101
4  grace@gracejunlaw.com

5

6  Attorney for Plaintiff Estate of Trevor Loflin and Paul Loflin

7

8  **UNITED STATES DISTRICT COURT**
   **CENTRAL DISTRICT OF CALIFORNIA**

9
   THE ESTATE OF TREVOR                CASE NO. 8:24-cv-01075-JVS-JDE
10 LOFLIN, by and through its
   successor in interest, Paul Loflin,  **FIRST AMENDED COMPLAINT**
11 Jr.; and PAUL LOFLIN, JR.,
12                                      1. Deliberate Indifference to Serious
                                           Medical Needs (42 U.S.C. § 1983)
13                          Plaintiffs,  2. Deprivation of Right of Familial
14 v.                                       Association (42 U.S.C. § 1983)
15 CITY OF HUNTINGTON                   3. *Monell* Municipal Liability (42
   BEACH, and DOES 7-25,                   U.S.C. § 1983)
16
17             Defendants.               **JURY TRIAL DEMANDED**
18
19
20
21
22
23
24
25
26
27
28

# I. INTRODUCTION

Trevor Loflin died on May 20, 2022 at the age of 26.  Trevor was the only son of Plaintiff Paul Loflin, Jr., and beloved by his extended family of grandparents, cousins, relatives, and friends.

On May 19, 2022, Huntington Beach Police Department officers arrested Trevor for being under the influence.  Trevor was drunk and swallowed four baggies of cocaine shortly before his arrest.  Instead of taking Trevor to the hospital, HBPD officers transported Trevor to the City Jail.  Jail nurses and detentions officers, Defendant DOES 7-25, ignored Trevor's worsening state as he began to exhibit symptoms of acute alcohol and cocaine intoxication.  Over the next 7 hours, officers and nurses, DOES 7-25, ignored Trevor as he became more agitated and restless, as he began to tremble and convulse, and as he had seizures that caused him to fall with such force that he sustained subdural hematomas. Had HBPD officers and nurses properly monitored and observed Trevor, they would have noticed his worsening condition.  HBPD officers and nurses should have sent Trevor to the emergency department.  Because these officers and nurses were deliberately indifferent to Trevor's serious medical needs, Trevor endured needless pain, suffering, and distress, eventually dying after suffering multiple seizures.

## II. GENERAL ALLEGATIONS AND PARTIES

1.    Jurisdiction is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) and (4), et seq.

2.    Venue is proper in the Central District of California because the acts or omissions which form the basis of Plaintiffs' claims occurred in Huntington Beach, California, within the Central District.

3.    At all times relevant to this complaint, decedent Trevor Loflin was an individual residing in Orange County, California.

1    4.    Paul Loflin, Jr., is decedent Trevor Loflin's father.

2    5.    Trevor Loflin died on May 20, 2022, while in the custody of the

3  Huntington Beach Police Department at the Huntington Beach City Jail.

4    6.    At the time of Trevor's death, Trevor was not married.  Trevor had no

5  children.  Trevor's mother died before him.  Trevor did not leave behind a will or

6  any other testamentary instrument or written document designating any heir or

7  beneficiary or making any donative transfer of property.  Trevor died intestate.

8    7.    As Trevor was not married and had no children, Paul Loflin, Jr.,

9  Trevor's father, is the heir to the Estate of Trevor Loflin and the successor in

10  interest to decedent Trevor Loflin. (See Exhibit 1, declaration of Paul Loflin, Jr.,

11  as successor in interest, incorporated herein by reference).

12    8.    This action on behalf of the Estate of Trevor Loflin is brought by Paul

13  Loflin, Jr., decedent's father, as his successor-in-interest. No proceeding for the

14  administration of the estate is pending and Paul Loflin, Jr. is the successor-in-

15  interest under California law and succeeds to the decedent's interests, claims, and

16  causes of action. There is no other person with a superior right to commence the

17  action.

18    9.    Paul Loflin, Jr., brings this action in his own right as well for the loss

19  of his child, Trevor Loflin.

20    10.    Defendant City of Huntington Beach is a public entity, duly organized

21  and existing under the laws of the State of California.  The Huntington Beach Police

22  Department is an agency of the City of Huntington Beach.  At all relevant times

23  mentioned herein, the City of Huntington Beach was responsible for the actions

24  and/or inaction, and the policies, procedures, and practices/customs of its

25  employees and/or agents.

26    11.    The City of Huntington Beach, by and through the Huntington Beach

27  Police Department ("HBPD"), owns, operates, and maintains the Huntington

28  Beach City Jail facility ("City Jail"), a Type I jail facility.  The jail facility is staffed

1    by both detentions officers and nurses. The nurses are responsible for medically
2    screening incoming inmates. The City Jail is located at 2000 Main Street,
3    Huntington Beach, CA 92648.

4         12.    After Trevor Loflin's death, Paul Loflin submitted a California Public
5    Records Act request to the Huntington Beach Police Department, requesting all
6    records related to Trevor's arrest and detention at the Huntington City Jail from
7    May 19, 2022 to May 20, 2022. The Huntington Beach PD refused to provide any
8    records responsive to his request.

9         13.    For these reasons, Plaintiffs are truly and genuinely ignorant of the
10   names and identities of the following defendants (DOES 7-25): the Huntington
11   Beach Police Department officers who arrested Trevor and transported him to the
12   City Jail; the HBPD detentions officers who booked Trevor into the City Jail; the
13   HBPD nurse(s) who medically screened Trevor and cleared him for entry to the
14   City Jail; and the HBPD detentions officers who were responsible for monitoring
15   Trevor and conducting safety checks on him.

16        14.    At all times relevant to this complaint, Defendants DOES 7-25 were
17   Huntington Beach Police Department officers and nurses who were responsible for
18   arresting Trevor; receiving and screening Trevor at the City Jail; and monitoring
19   Trevor once he was detained at the City Jail. Plaintiffs are truly ignorant of the true
20   names and capacities of Does 7 through 25, inclusive, and/or is truly ignorant of
21   the facts giving rise to their liability and will amend this complaint once their
22   identities have been ascertained as well as the facts giving rise to their liability.

23        15.    These defendants were agents, servants and employees of each other
24   of the other named defendants and were acting at all times within the full course
25   and scope of their agency and employment, with the full knowledge and consent,
26   either expressed or implied, of their principal and/or employer and each of the other
27   named defendants thereby making the currently named defendants herein liable for
28   the acts and/or omissions of their agents, servants and/or employees.

1

## III.   FACTS REGARDING THE DEATH OF TREVOR LOFLIN

2      16.    Plaintiffs reallege all prior paragraphs and allegations of this

3  complaint and incorporate the same herein.

4      17.    On May 19, 2022, Trevor Loflin was arrested by HBPD officers at a

5  liquor store for public intoxication.

6      18.    Upon information and belief, Trevor swallowed the four baggies of

7  cocaine shortly after HBPD officers contact with him.  After arresting him for

8  public intoxication, HBPD officers transported Trevor to the City Jail.

9      19.    "At the time of arrest and detention, it has been estimated that 70 to

10  80 percent of all inmates in local jails and State and Federal prisons had regular

11  drug use or had committed a drug offense, and 34 to 52 percent of these inmates

12  were intoxicated at the time of their arresting offense."  Center for Substance

13  Abuse Treatment, 2006, *Detoxification and Substance Abuse Treatment,*

14  Treatment Improvement Protocol (TIP) Series, No. 45, HHS Publication No.

15  (SMA) 15-4131, Rockville, MD: Substance Abuse and Mental Health Services

16  Administration, retrieved November 1, 2023 from

17  https://store.samhsa.gov/sites/default/files/d7/priv/sma15- 4131.pdf ("TIP 45"), at

18  p. 118.

19      20.    "Drug or alcohol intoxication has accounted for an increasing share

20  of deaths in local jails over time.  It accounted for 15% of all deaths in 2019, after

21  suicide and heart disease (25%).  The rate of intoxication deaths more than

22  quadrupled, from 6 per 100,000 in 2000 to 26 per 100,000 in 2019."  E. Ann

23  Carson, 2021, "Mortality in Local Jails, 2000-2019 - Statistical Tables," *Bureau*

24  *of Justice Statistics Statistical Tables*, Washington, DC: U.S. Department of

25  Justice, Bureau of Justice Statistics, retrieved December 17, 2021 from

26  https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf, at p. 3.

27      21.    The Coroner determined Trevor's cause of death was acute cocaine

28  and ethanol with cocaethylene intoxication.  Use of cocaine and alcohol together

1    produces a toxic byproduct called cocaethylene.  Cocaethylene is 10 times more

2    cardiotoxic than cocaine alone.  Cocaethylene will rapidly increase blood pressure

3    and heart rate.  Because cocaethylene has a longer half-life than cocaine, the

4    combination of cocaine and alcohol will cause a longer lasting and more intense

5    psychoactive effect.

6         22.    At approximately 11:00pm, Trevor was booked into the City Jail

7    located at 2000 Main Street in Huntington Beach.  There was no illicit drugs or

8    paraphernalia located on his person at the time of booking.  Because the Coroner

9    found four small baggies of cocaine in Trevor's stomach, upon information and

10   belief, Trevor swallowed the four baggies of cocaine shortly after HBPD officers

11   made contact with him.

12        23.    DOES 7-25 are HBPD detentions officers and nurses who were

13   responsible for screening and evaluating Trevor Loflin for booking into the jail.

14   DOES 7-25 knew, or should have known, that Trevor was under the influence of

15   drugs and alcohol, was not fit for booking, and should have been sent to a hospital

16   emergency department. DOES 7-25 knew that Trevor was at risk of intoxication

17   or withdrawal from drugs and/or alcohol based on the information provided by

18   the arresting officers. DOES 7-25 placed Trevor in a sobering cell. By placing

19   Trevor in a sobering cell, DOES 7-25 indicated they knew that Trevor was a

20   medically vulnerable inmate who may require further medical care, monitoring,

21   and attention due to his state of intoxication.

22        24.    DOES 7-25 are also HBPD detentions officers and nurses who were

23   responsible for monitoring Trevor in the sobering cell.  According to statements

24   made by HBPD officials to Trevor's grandmother after Trevor's death, the

25   sobering cell was a padded cell and equipped with video surveillance cameras.

26   Detentions officers monitored the live video feed every 15 minutes.  HBPD

27   officials told Trevor's grandmother that a detentions officer noticed Trevor

28   having convulsions.

25.     According to the Coroner's investigative report, the sobering cell is physically checked by detentions officers every 30 minutes and there is a live camera feed that is monitored.

26.     Trevor was in the custody of the HBPD police, at the City Jail, for almost 7 hours before his death. DOES 7-25 were responsible for watching Trevor on the live video feed every 15 minutes. DOES 7-25 were further responsible for physically checking and observing Trevor in person every 30 minutes. But, as explained below, DOES 7-25 failed to monitor the live video feed every 15 minutes and failed to physically assess Trevor every 30 minutes.

27.     Signs and symptoms of cocaine intoxication include fever, sweating, rapid speech, anxiety, agitation, restlessness, confusion, muscle tremors, increased heart rate and blood pressure, enlarged pupils, irregular heart rhythm, loss of awareness of surroundings, difficulty breathing, and seizures.

28.     Severe intoxication can manifest as delusion, delirium, panic and mania, with high temperature, flushing and profuse sweating.  Life threatening effects include violence to self or others, hallucinations, tachycardia, hypertension, severe chest pains and circulatory collapse, and can be followed by seizures and death.  Psychoses are possible at any level but are more commonly associated with higher blood concentrations.

29.     Over the next 7 hours, Trevor began exhibiting signs of acute cocaine intoxication.  Trevor began having tremors and convulsions in the sobering cell.  He was agitated and restless. He suffered profuse sweating and evidenced confusion.

30.     Although DOES 7-25 believed Trevor was drunk, Trevor did not fall asleep in the sobering cell.  He was not sluggish.  Instead, the video surveillance of the sobering cell showed Trevor awake the entire night; he was agitated, restless, sweaty, and shaking – all symptoms indicating he was acutely

1   intoxicated. Despite this knowledge, DOES 7-25 failed to provide Trevor

2   immediate medical care.

3     31. Had DOES 7-25 actually monitored and observed Trevor every 15 to

4   30 minutes as they claimed, whether via physical inspection or video surveillance,

5   DOES 7-25 would have noticed Trevor's worsening condition. DOES 7-25 would

6   have known, that Trevor was not simply drunk. Had DOES 7-25 actually

7   monitored Trevor as required, they would have known, that Trevor was exhibiting

8   the signs and symptoms of acute intoxication from a stimulant drug.

9     32. Even though Trevor's condition visibly deterioriated, and he

10   showed signs of acute intoxication such as tremors, shaking, agitation, and

11   restlessness, DOES 7-25 did not intervene to provide urgent medical care to

12   Trevor. DOES 7-25 failed to provide medical care to Trevor while he was in

13   distress because they failed to monitor the live feed every 15 minutes and failed

14   to physically check on Trevor's well-being in-person every 30 minutes.

15     33. On May 19, 2022, the date of Trevor's arrest and detention at the

16   City Jail, pre-trial detainees such as Trevor Loflin had the clearly established right

17   to "direct-view safety checks sufficient to determine whether their presentation

18   indicates the need for medical treatment." *Gordon v. Cnty. of Orange*, 6 F.4th

19   961, 973 (9th Cir. 2021)

20     34. Trevor Loflin's death as a result of acute intoxication occurred

21   because Defendant DOES 7-25 ignored the signs and symptoms of lethal

22   intoxication, which Trevor began to exhibit over the course of 7 hours while

23   confined in the sobering cell of the Huntington Beach City Jail.

24     35. Trevor began shaking and exhibiting seizure-like activity.  The

25   seizures caused him to fall to the concrete floor and strike his head.  Trevor

26   suffered subdural hematomas, meaning he had brain bleeds caused by blunt force

27   trauma.

28

36.    Had DOES 7-25 monitored the live video feed every 15 minutes and conducted physical safety checks of Trevor's person every 30 minutes as required, DOES 7-25 would have noticed that Trevor needed immediate medical attention.

37.    Jail surveillance video documented shakes and seizures that Trevor suffered even before his death.

38.    At 05:54 am on May 20, 2022, surveillance video showed Trevor began to shake.  At 5:58am, Trevor had another seizure.  When a detention officer conducted a regular cell check after 6:01am, that officer found Trevor having another seizure.  The officer called for emergency medical aid.

39.    The Huntington Beach Fire Department and paramedics responded to provide medical aid to Trevor.  They pronounced him dead at 6:35am.

40.    After Trevor's death, Trevor's grandmother, Marcia, called HBPD multiple times to inquire about the circumstances of Trevor's death.  An HBPD official informed Marcia that the Orange County Sheriff's Department would be conducting an investigation.

41.    Trevor's father, Paul, repeatedly called an investigator named Womack of the OC Sheriff's Department to inquire about the status of the investigation.   Paul never received any information about the progress of the investigation.  Paul was only told there was an ongoing investigation.  Once the investigation was completed, Paul was informed the case would be referred to the Orange County District Attorney's Office for a determination as to whether criminal charges needed to be filed.

42.     In late 2023, Paul spoke to Steven Shriver of the Orange County DA's office.  Paul was told the OCDA was reviewing the investigation to determine whether criminal charges needed to be filed.

43.    In February 2024, the OCDA finally called Paul to inform him there was no criminal wrongdoing that caused the death of Trevor.

44.   On April 30, 2024, HBPD sent the following correspondence to Paul in response to his request for police records related to Trevor's arrest and subsequent death:

> At this time, the Huntington Beach Police Department is unable to release the requested report to you as there is still an open criminal case for our agency related to this case. Release of this information could jeopardize the criminal investigations and/or endanger victims or witnesses to these incidents. These exemptions are allowed under California Government Code Sections 7923.610 [formerly 6254(f) and 6254(f) (1)] and Haynie v Superior Court (2001) 26 C 4th 1061.

45.   As of the filing date of the complaint, Paul Loflin has not received any information regarding the names, identities, and actions, or lack thereof, of any HBPD officer or nurse who had contact with Trevor Loflin from May 19-20, 2022.

## IV.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS (42 U.S.C. § 1983) DELIBERATE INDIFFERENCE TO TREVOR LOFLIN'S SERIOUS MEDICAL NEEDS**

**[BY THE ESTATE OF TREVOR LOFLIN AGAINST DOES 7-25]**

46.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

47.   42 U.S.C. § 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory subjects, or causes to be subjected, any person of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit at equity or other proper proceeding for redress.

48.   Defendant DOES 7-25, and each of them, violated Trevor Loflin's Fourth and Fourteenth Amendment right to medical care.

49.     DOES 7-25 are HBPD detentions officers and nurses who were responsible for screening and evaluating Trevor Loflin for booking into the jail and who were responsible for monitoring him while he was detained.  DOES 7-25 knew, or should have known, that Trevor was under the influence of drugs and alcohol, was not fit for booking, and should have been sent to a hospital emergency department.  Instead, DOES 7-25 placed Trevor in a sobering cell and ignored him when he began exhibiting signs and symptoms of acute intoxication.

50.     DOES 7-25 failed to render aid to Trevor as they monitored and observed him for almost 7 hours.  DOES 7-25 were required to monitor the live video feed every 15 minutes and to physically check on Trevor's person every 30 minutes. **They failed to do so over the course of 7 hours**. Had DOES 7-25 properly monitored Trevor, they would have Trevor exhibit signs and symptoms of acute intoxication, including agitation, restlessness, shaking, tremors, convulsions, and seizures.

51.     Had DOES 7-25 actually monitored and observed Trevor every 15 to 30 minutes as they were required to do so under the Jail's policies, whether via physical inspection or video surveillance, DOES 7-25 would have noticed Trevor's worsening condition.  DOES 7-25 would have seen Trevor suffer convulsions, shaking, falling, and suffering blunt force head trauma.  DOES 7-25 would have seen Trevor exhibiting seizure like activity.

52.     Because DOES 7-25 failed to properly monitor and observe Trevor, they failed to render aid, call for a doctor, monitor and observe Trevor's condition, or transport him to the hospital.

53.     DOES 7-25, based on their training and experience, including POST certification, knew that people who abuse stimulant drugs are at higher risk of acute intoxication and death.   But Defendants ignored the obvious signs of Trevor's acute intoxication and agitation and ignored their obligation to monitor him.

54.     Defendants were deliberately indifferent to Trevor's known and serious medical needs, which caused harm to the decedent.

55.     By failing to properly treat and monitor Trevor's serious medical condition despite knowing he was suffering acute drug intoxication, Defendants were deliberately indifferent to Trevor's serious medical needs. As a direct consequence of these failures, Trevor's serious medical condition was ignored by jail staff.

56.     On May 19, 2022, the date of Trevor's arrest and detention at the City Jail, Trevor Loflin, a pretrial detainee, had the clearly established right to "direct-view safety checks sufficient to determine whether [his] presentation indicates the need for medical treatment." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021).

57.     As a direct and proximate result of Defendants' deliberate indifference to Trevor Loflin's serious medical condition, Trevor experienced physical pain, severe emotional distress, and mental anguish, as well as the loss of his life.

58.     The conduct alleged herein caused Trevor Loflin to be deprived of his civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably and actually caused Trevor to suffer emotional distress, pain and suffering and death and further damages all in an amount to be shown according to proof at the time of trial.

59.     The conduct as alleged herein was done in deliberate or reckless disregard of decedent's constitutionally protected rights; justifying the award of exemplary damages against Defendant DOES 7-25 in an amount to be shown according to proof at the time of trial in order to deter the defendants from engaging in similar conduct and to make an example by way of monetary punishment. Plaintiffs are also entitled to an award of attorney fees and costs of suit herein.

///

///

## SECOND CAUSE OF ACTION

**VIOLATION OF FIRST AND FOURTEENTH AMENDMENTS (42 U.S.C. § 1983)**
**DEPRIVATION OF THE RIGHT OF ASSOCIATION**
**[BY PLAINTIFF PAUL LOFLIN, JR. AGAINST DOES 7-25]**

60.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

61.    Defendant DOES 7-25 deprived Trevor Loflin of his rights under the United States Constitution to be free of denial of medical care and denial of due process. For over 7 hours, DOES 7-25 witnessed Trevor Loflin exhibit signs and symptoms of intoxication, including shakes, agitation, and excessive sweating, but they failed to provide adequate medical care.

62.    The aforementioned acts and/or omissions of DOES 7-25 in ignoring Trevor Loflin's serious medical needs, failing to adequately monitor and observe him, and failing to intervene to render medical aid when Trevor began exhibiting signs and symptoms of acute intoxication, caused the untimely and wrongful death of Trevor Loflin.  The conduct of DOES 7-25 deprived Plaintiff Paul Loflin of his liberty interests in his relationship with his son, Trevor.  This violated Paul's substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

63.    There was no legitimate penological interest in depriving Trevor Loflin of needed medical care as he exhibited signs of acute intoxication, as his condition progressively worsened, and as Trevor began suffering seizures.

64.    There was no legitimate penological interest in failing to communicate critical medical information and denying access to medical care to an inmate in severe and obvious medical danger and distress.  There was no legitimate reason for failing to take Trevor to the hospital.

65.    The deprivation of the rights alleged above has destroyed the constitutional rights of Paul Loflin to the society, care, companionship, comfort,

1    and assistance his son, a right that is protected by the substantive due process

2    clause of the Fourteenth Amendment.

3        66.    The conduct alleged herein violated Trevor Loflin's rights as alleged

4    above, thereby legally, proximately, foreseeably and actually causing Plaintiff

5    Paul Loflin to suffer damages in an amount to be shown at the time of trial.

6                        **THIRD CAUSE OF ACTION**

7    *MONELL* **MUNICIPAL LIABILITY (42 U.S.C. § 1983)**
     **[BY PLAINTIFFS AGAINST CITY OF HUNTINGTON BEACH]**

8

9        67.    Plaintiffs reallege all prior paragraphs of this complaint and

10   incorporate the same herein by this reference.

11       68.    "At the time of arrest and detention, it has been estimated that 70 to

12   80 percent of all inmates in local jails and State and Federal prisons had regular

13   drug use or had committed a drug offense, and 34 to 52 percent of these inmates

14   were intoxicated at the time of their arresting offense."  Center for Substance

15   Abuse Treatment, 2006, *Detoxification and Substance Abuse Treatment,*

16   Treatment Improvement Protocol (TIP) Series, No. 45, HHS Publication No.

17   (SMA) 15-4131, Rockville, MD: Substance Abuse and Mental Health Services

18   Administration, retrieved November 1, 2023 from

19   https://store.samhsa.gov/sites/default/files/d7/priv/sma15- 4131.pdf ("TIP 45"), at

20   p. 118.

21       69.    "Drug or alcohol intoxication has accounted for an increasing share

22   of deaths in local jails over time.  It accounted for 15% of all deaths in 2019, after

23   suicide and heart disease (25%).  The rate of intoxication deaths more than

24   quadrupled, from 6 per 100,000 in 2000 to 26 per 100,000 in 2019."  E. Ann

25   Carson, 2021, "Mortality in Local Jails, 2000-2019 - Statistical Tables," *Bureau*

26   *of Justice Statistics Statistical Tables*, Washington, DC: U.S. Department of

27   Justice, Bureau of Justice Statistics, retrieved December 17, 2021 from

28   https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf, at p. 3.

70.     "Among sentenced individuals in jail, 63 percent have an SUD [substance use disorder], compared to 5 percent of adults who are not incarcerated. From 2000 to 2019, the number of local jail inmates who died from all causes increased 33 percent; **the number who died from drug/alcohol intoxication during the same period increased 397 percent**." *Managing Substance Withdrawal in Jails: A Legal Brief*, Bureau of Justice Assistance, U.S. Department of Justice, February 2022, available at: https://bja.ojp.gov/library/publications/managing-substance-withdrawal-jails-legal-brief (last accessed May 16, 2024.)

71.     The U.S. Department of Justice's manual for local jails, *Guidelines for Substance Withdrawals in Jails*, makes clear that "Smaller jails, or jails with fewer internal resources, are expected to meet the same standards of care as larger, better-resourced jails. . . For example, it is expected that shortly after arrival at a jail, all individuals are screened for their risk of substance withdrawal."

72.     The DOJ's guidelines state, "[a]ll individuals, regardless of their length of stay in jail, should be screened for risk of withdrawal. Screening is critical to fully understanding and meeting the often acute and complex substance withdrawal-related needs of individuals entering jail. Screening will help identify individuals in need of immediate clinical assessment, including anyone who:

   • Reports or is known to have used alcohol or sedatives recently, regularly, and heavily."

73.     The DOJ's guidelines for local jails emphasize, "A major goal of the initial clinical assessment in a jail setting is to address the need for swift action to avoid critical biomedical or psychiatric issues related to intoxication or withdrawal (e.g., acute withdrawal syndromes, overdose, suicidality, and other acute psychiatric symptoms). Findings of the clinical assessment inform whether

1  the patient's needs can be addressed at the jail or require transfer to a higher level

2  of care."

3      74.    Because of the prevalence of substance use disorders among

4  arrestees and detainees in jails, and the high rate of morality among such persons

5  suffering from intoxication or withdrawal, Defendant City of Huntington Beach

6  knew that it had to implement sufficient policies and protocols to identify,

7  monitor, and treat intoxicated arrestees or arrestees at risk of life-threatening

8  withdrawal.

9      75.    There were longstanding and systemic deficiencies in the City Jail's

10  treatment of inmates.  Deficiencies included failure to render medical care, failure

11  to identify critical and obvious medical needs at intake; failure to properly screen

12  for immediate medical needs; failure to implement drug intoxication and

13  withdrawal protocols, including the use of scales, to treat inmates suffering from

14  drug or alcohol withdrawal; improper cell checks; inadequate medical staffing;

15  lack of required training on screening; lack of communication of necessary and

16  critical medical information among staff for continuity of care; and non-

17  compliant medical policies and procedures.

18      76.    Upon information and belief, the written policy on identification and

19  treatment of acute drug intoxication and agitation was deficient on its face. It did

20  not sufficiently train staff on how to recognize signs of acute stimulant

21  intoxication, or provide standards for rejecting acutely intoxicated inmates and

22  deeming them unfit to enter the jail, or establish protocols to ensure acutely

23  intoxicated inmates were sent to a hospital.

24      77.    The written policy was deficient in its failure to specify the treatment

25  and monitoring protocol required to deal with the acute drug intoxication and/or

26  subsequent withdrawal.

27

28

78.    The written policy was deficient on its face because it failed to specify when medical staff were required to refer the patient to a doctor or transport the patient to the hospital.

79.    Had the City Jail employed the use of scales to monitor Trevor's level of intoxication and withdrawal in accordance with DOJ and NCCHC national standards, Trevor's vitals and symptoms would have been monitored at regular intervals, at least every 3 to 4 hours, by registered nurses beginning at 11:00 pm on May 19, 2022.  Had intoxication and withdrawal scales such as COWS, CIWA-Ar, CIWA-Br been implemented and required to be used, the signs and symptoms of withdrawal, including increased heart rate, dilated pupils, worsening blood pressure, increased temperature, sweating, agitation, tremors, convulsions, and seizures, would have been noticed by medical staff before Trevor's death at approximately 6:00 a.m. on May 20, 2022.  Had the City Jail implemented a constitutionally adequate intoxication/withdrawal screening, assessment, and monitoring protocol through the use of validated and nationally accepted scales, DOES 7-25 could have recognized Trevor's worsening condition and sent him to a hospital.

80.    There was a *de facto* custom of allowing staff to fail render care to patients suffering acute drug intoxication and agitation and ignoring the obvious symptoms and risk factors, including leaving them unsupervised in a holding cell.

81.    There was a *de facto* custom of not properly screening patients for medical care or treatment.  Booking inmates who had ingested a dangerous or lethal quantities of stimulant drugs was a recurring situation, which occurred almost daily in City Jail.

82.    There was a *de facto* custom of ignoring critical medical information and not properly checking on the welfare of patients, even those known to have serious medical needs.

83.    There was a *de facto* custom of not ensuring that deputies follow the policies and procedures with respect to emergency situations within Housing units.

84.    There was a *de facto* custom of failing to conduct proper cell checks or monitoring, as required by the County's own written policies.

85.    Defendant failed to properly train its detentions officers and arresting officers to understand the signs and symptoms of acute intoxication.  Give the high incidence of arrest of intoxicated individuals, and the high rate of death in jails of people suffering from substance use disorders, Defendants had notice of the need to adequately train its officers to recognize the signs and symptoms of acute intoxication. Defendant's failure to train its subordinates infers the existence of a municipal custom that authorized or condoned officer indifference to the signs of acute intoxication.

86.    The policies and customs of the City of Huntington Beach were not adequate to prevent violations of law by its employees, and were not adequate to train its officers and employees to handle the usual and recurring situations with which they must deal.

87.    The City of Huntington Beach was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law by its employees and the known or obvious consequences of its failure to train its officers and employees adequately.

88.    The City is further liable because the cumulative and persistent failures and misdeeds of the entire police department caused the ultimate injury and harm suffered by decedent Trevor Loflin. Trevor's constitutional deprivations were not only caused by the conduct of individual HBPD officers and nurses, but also resulted from the collective inaction of the Huntington Beach Police Department.  Plaintiff's constitutional deprivations were further caused by the subordinates' adherence to customs and practices as alleged herein. *See Fairley*

1    *v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); *see also Horton by Horton v. City of*

2    *Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019).

3        89.     As a result of the City's properly train its officers and nurses, and its

4    failure to promulgate constitutionally adequate withdrawal and intoxication

5    measurement and monitoring programs, the City of Huntington Beach was

6    deliberately indifferent to the needs of Trevor Loflin. The failure to train its

7    officers and nurses, and the City's failure to rectify constitutionally deficient

8    customs and practices, were the moving force behind the misconduct of the

9    officers, the denial of medical care to Trevor Loflin, and his resulting pain,

10   suffering, and death.

### V. RELIEF REQUESTED

     **WHEREFORE**, Plaintiffs pray as follows:

1.    For general and special damages according to proof at the time of trial;

2.    For punitive damages against all individual defendants;

3.    For all other damages, costs, interest, and attorneys' fees as allowed by
     law; and

4.    Any other relief this court deems just and proper.

### VI.  DEMAND FOR JURY TRIAL

     Pursuant to the Seventh Amendment of the United States Constitution and

Fed. R. Civ. P. 38, Plaintiffs hereby demand a jury trial on all issues alleged in

this complaint.

                  Respectfully submitted,

 Dated:  November 14, 2024

                  s/ Grace Jun

                  GRACE JUN
                  Attorney for Plaintiffs THE ESTATE OF
                  TREVOR LOFLIN and PAUL LOFLIN, JR.